# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EDWARD WILEY BRADEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-14-258-RAW-SPS |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

The claimant Edward Wiley Braden requests judicial review of a final decision of the Commissioner of the Social Security Administration, granting his social security benefits for a closed period from March 10, 2010 through March 11, 2011, and terminating his benefits thereafter, pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision to terminate his benefits and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled after March 11, 2011. For the reasons set forth below, the Commissioner's decision should be REVERSED.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity. Step Two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born September 25, 1963 and was forty-eight years old at the time of the administrative hearing (Tr. 36). He completed the eleventh grade and has no qualifying past relevant work (Tr. 23, 151). The claimant alleges that he has been unable to work since an amended onset date in March 2010, due to a heart condition, dental problems, amputated fingers, and a leg injury (Tr. 35, 150).

## Procedural History

On March 8, 2010, the claimant protectively applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. His application was denied. ALJ Lantz McClain conducted an administrative hearing and determined that (i) the claimant was disabled beginning March 10, 2010, but (ii) his disability terminated on March 12, 2011, in a written opinion dated September 26, 2012 (Tr. 11-24). The Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

## Decision of the Administrative Law Judge

In his written opinion, the ALJ determined that the claimant was disabled from March 10, 2010, through March 11, 2011 because the severity of his cardiac conditions and the residuals from heart surgery met sections 4.02 and 4.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listing). The ALJ then determined that the claimant's disability did not continue through the date of the decision. More specifically, the ALJ

determined that the claimant had not developed any new impairment or impairments since March 12, 2011, that he did not meet a listing, and that the claimant experienced medical improvement as of March 12, 2011 so that he no longer met a listing.[2] He then found that the claimant retained the residual functional capacity (RFC) to lift/carry up to ten pounds occasionally and up to ten pounds frequently, sit (with normal breaks) for up to six hours in an eight-hour workday, and stand/walk (with normal breaks) for up to two hours in an eight-hour workday (Tr. 17). The ALJ concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work in the regional and national economy that he could perform, *e. g.*, touch up screener and hand suture winder (Tr. 23).

## Review

The claimant contends that the ALJ erred in finding that his disability ceased beginning March 12, 2011 for following reasons: (i) by failing to consider the effect of impairments that developed following his open heart surgery, (ii) by relying on a state reviewing physician opinion by Dr. Earl F. Beard that was not based on a full review of all medical evidence in the record, (iii) by ignoring non-exertional limitations proposed by Dr. Beard, (iv) by applying the incorrect standards in evaluating a treating physician opinion, and (v) by failing to shift the burden to the Commissioner when terminating

---

[2] "When an ALJ grants benefits to a claimant for a closed period, two decision-making processes occur. First, the ALJ finds the claimant disabled and grants benefits. Second, the ALJ engages in the benefits-cessation decision-making process. Under the latter process—the subject of Ms. Newbold's appeal—the ALJ must determine 'if there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether the medical improvement is related to [his] ability to work.'" *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) [internal citations omitted], *quoting* 20 C.F.R. § 404.1594(a).

-4-

benefits. Because the ALJ does appear to have improperly terminated benefits beginning March 12, 2011, the decision of the Commissioner should be reversed.

The ALJ determined that the claimant had the severe impairment of status post heart surgery, as well as the nonsevere impairment of depression (Tr. 14). The medical evidence reveals that the claimant had severe aortic regurgitation with severe left ventricular enlargement and preserved left ventricular systolic function, with ejection fraction of 55-60%, and mild 2-vessel coronary artery disease diagnosed following a heart catheterization on March 9, 2010 (Tr. 266-267). As a result, the claimant underwent an aortic valve replacement surgery on April 15, 2010 (Tr. 377). The claimant was discharged on April 21, 2010, but readmitted on April 27 with complaints of weight loss, pain, and insomnia (Tr. 405). Upon discharge, the claimant was restricted from heavy lifting over ten pounds, could not drive, and was told to gradually resume normal activities (Tr. 401).

On June 3, 2010, the claimant underwent a follow-up scan of his chest, which revealed: (i) status post cardiac valve replacement with discoid atelectasis and/or fibrosis, left lung; (ii) slight increase in elevation of the left hemidiaphragm, most likely due to the gas in the bowel rather than volume loss; and (iii) degenerative disk disease of the thoracic spine (Tr. 469). A follow-up scan on September 10, 2010 revealed: (i) status post aortic valve replacement with chronic fibrotic changes and mild interval worsening of elevation of the left hemidiaphragm, and (ii) degenerative changes of the thoracic spine (Tr. 499). An October 12, 2010 CT of the thoracic spine revealed slight improvement in the left lower lobe subsegmental atelectatic changes, the status post

aortic valve replacement with prosthesis appeared stable, and there were atherosclerotic vascular changes (Tr. 495). A follow-up SNIFF test confirmed the elevated left hemidiaphragm with left lower lobe plate atelectasis, but showed no definite diaphragm paralysis (Tr. 658). On February 26, 2011, another chest frontal view was performed, revealed "considerable elevation of the left hemidiaphragm" that had developed since the previous study, but it was of uncertain etiology or significance, although it was noted that it had not been present a year previously, on February 27, 2010 (Tr. 674). An upper GI study with contract was performed on March 30, 2011, and revealed no hiatal hernia, but elevation of the left hemidiaphragm with fundus located underneath the hemidiaphragm, as well as moderate gastroesophageal reflux (Tr. 600).

On September 30, 2010, Dr. Wojciech L. Dulowski, M.D., conducted a consultative physical examination of the claimant, and assessed the claimant with history of open heart surgery, artificial valve replacement with cardiomyopathy; history of hyperlipidemia; history of hypertension; history of GERD; and history of major depression (Tr. 491). On December 9, 2010, state reviewing physician Dr. Luther Woodcock determined that the claimant could perform the full range of sedentary work (Tr. 636).

On September 1, 2010, the claimant underwent a mental status examination with Dr. Kenny A. Paris, Ph.D. (Tr. 477). Dr. Paris found the claimant had low average intellectual functioning and assessed the claimant with major depressive disorder, moderate, and assigned a global assessment of functioning score of 45 (Tr. 481). He further stated that the claimant's application was based on both mental and physical

problems, which should be taken into account because "the combination of mental and physical symptoms leads to greater impairment and makes him less likely to be successful in a job setting" (Tr. 481). Dr. Paris estimated that the claimant's ability to perform adequately in most job situations, handle the stress of a work setting, and deal with supervisors or co-workers was below average, although his judgment was estimated as adequate. Dr. Paris further indicated that the claimant's condition was unlikely to improve in twelve months (Tr. 482). On December 29, 2010, a state reviewing physician determined that the claimant did not have a severe mental impairment, noting that he was more affected by his physical condition (Tr. 644-656).

On March 8, 2011, the claimant was seen at Cardiovascular Surgical Specialists Corp, and treatment notes reflect that the claimant was breathing "OK," "still lots chest pain," and the claimant reported that he had recently been admitted to the ER and was diaphoretic and couldn't focus. Notes reflect the claimant still had an increased left hemidiaphragm that was much more obvious on a recent chest x-ray, and the claimant looked pale (Tr. 779). He was assessed with episodic chest pain with shortness of breath, and referred for a Holter monitor (which was ultimately unremarkable) as well as a CT scan (Tr. 779, 827). A chest x-ray that same day revealed increasing lingular subsegmental atelectasis and an elevated right hemidiaphragm with hyperinflated lungs (Tr. 802). An April 8, 2011 echocardiogram revealed that the left ventricle was hyperdynamic and the gradient across the aortic valve was mildly increased, but that the prosthesis appeared to be functioning normally (Tr. 818). Additionally, the left ventricular function was slightly decreased to 50%, but there appeared to be no

significant coronary artery disease (Tr. 823). A CT of the thorax revealed a shift of the mediastinum to the right, and left lower lobe atelectasis and consolidation with eventration or hernia of the left lower diaphragm with some herniation of valve and spleen into the chest (Tr. 825).

The claimant was referred to a pulmonologist, Dr. V. Thomas Smith, on July 22, 2011, who assessed the claimant with left hemidiaphragmatic elevation post surgery in a long-term smoker, and episodes of acute shortness of breath that would appear to be some sort of rhythm problem (Tr. 831). Chest x-rays revealed no significant changes when compared to the March 2, 2011 study (Tr. 853). The claimant returned to Dr. Smith several times, including on January 6, 2012, at which time Dr. Smith opined that, following a bronchoscopy, there was no evidence for malignancy and probable evidence for trapped lung from previous surgery (Tr. 893).

On November 28, 2011, the claimant's treating physician at Cardiovascular Surgical Specialists, Dr. George Cohlmia, prepared a letter to the claimant's treating physician at the Wilma Mankiller Health Center, Dr. Randall Turner, D.O., stating that the claimant continued to complain of chest pain and some shortness of breath, which Dr. Cohlmia believed was chest wall related (Tr. 865). An angiogram perform on February 3, 2012, revealed normal intracranial arterial supply (Tr. 872-873).

On March 23, 2012, Dr. Turner completed a physical Medical Source Statement regarding the claimant, finding that he could occasionally lift less than ten pounds, stand/walk less than two hours in an eight-hour workday, and sit at least two hours but less than six (Tr. 911). He stated that the claimant could "sometimes" walk a block at a

reasonable pace, but stated that he was still having problems related to his open heart surgery, and that he anticipated the claimant's impairments would cause three or more absences from work per month (Tr. 912). Dr. Turner deferred any additional limitations to be explained by the claimant's cardiologist (Tr. 912).

The ALJ then sent a medical interrogatory to Dr. Beard, to assess the claimant's physical impairments beginning March 20, 2010 through the present (Tr. 914). Some confusion developed when Dr. Beard returned his personal notes rather than the assessment, but Dr. Beard prepared a letter clarifying his findings and re-submitted a physical RFC assessment in which he stated that prior to the claimant's surgery, the expected recovery time would be six months to one year, but conditions present indicated the claimant should be "kept at light physical activity for therapeutic purposes + that this is about all he will tolerate from a symptomatic purposes" (Tr. 926). Dr. Beard further indicated that the claimant could sit for two hours at a time and up to six hours in an eight-hour workday, stand/walk for one hour at a time and up to six hours in an eight-hour workday, that his arms and hands were not affected, that he could use his feet occasionally, could never climb ladders or scaffolds, but could occasionally climb stairs and ramps, balance, stoop kneel, crouch, and crawl (Tr. 934-936). He further indicated that the claimant could never work around unprotected heights, extreme cold or heat, or pulmonary irritants, and only occasionally work around moving mechanical parts, operate a motor vehicle, work in humidity and wetness, or around vibrations (Tr. 937).

To determine whether disability benefits should continue, the ALJ is required to "follow specific steps in reviewing the question of whether your disability continues." 20

C.F.R. § 416.994(b)(5). These steps are outlined in 20 C.F.R. § 416.994(b)(5). Step one requires the ALJ to determine with the claimant has an impairment or combination of impairments that meets or equals a Listing. Step two requires a determination that there has been medical improvement as shown by a decrease in medical severity. At step three, the ALJ must determine whether the medical improvement is related to the ability to do work. At step four, if there has been no medical improvement, or it is not related to the ability to work, the ALJ must determine if an exception applies. At step five, if medical improvement is shown to be related to the ability to do work, or an exception applies, the ALJ must determine if all current impairments are severe, including a consideration of all current impairments and the impact of the combination of these impairments. If one or more impairments are considered severe, the ALJ must assess at step six the ability to perform SGA and whether the claimant could perform past relevant work. At step seven, if the claimant cannot perform past relevant work, the ALJ must determine if there is other work the claimant could perform.[3] *See* 20 C.F.R. § 416.994(b)(5). For each of these steps, the burden is on the Commissioner in a termination-of-benefits review. *See Hayden v. Barnhart*, 374 F.3d 986, 991 (10th Cir. 2004).

In this case, the ALJ determined in his written opinion that the claimant was under a disability from March 10, 2010 through March 11, 2011, then proceeded through the steps set out in 20 C.F.R. § 416.994(b)(5). The ALJ determined that the claimant had not

---

[3] The eighth step, related to past relevant work, is not applicable in this case. *See* 20 C.F.R. § 416.994(b)(5)(viii).

developed any new impairment or impairments since March 12, 2011, and that the claimant therefore had the same severe impairments as before, namely, status post heart surgery (Tr. 17). He then determined that there was no evidence to find the claimant met a listing, and that the claimant had experience medical improvement as of March 2, 2011 because Dr. Beard reported that the typical recuperative period for such surgical intervention was between six months and one year (Tr. 17). Next, the ALJ determined that the claimant's medical improvement was related to his ability to work because his severe impairment no longer met a listing. The ALJ then determined that the claimant could lift/carry up to ten pounds occasionally and ten pounds frequently, sit (with normal breaks) for up to six hours in an eight-hour workday, and stand/walk (with normal breaks) for up to two hours in an eight-hour workday (Tr. 17). In support, the ALJ summarized the claimant's hearing testimony, as well as much of the medical evidence in the record (Tr. 17-23). More specifically, the ALJ rejected Dr. Turner's RFC assessment, asserting without support that he "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant," and instead adopted Dr. Beard's assessment, noting that he was a board certified cardiologist with significant credentials, rather than the family practitioner that Dr. Turner was (Tr. 22). He then indicated that he gave great weight to the state reviewing physicians' opinions as well, finding that they were consistent with his assessed RFC. These findings contain a number of errors as set forth below.

First, the ALJ asserted without reference to the record that the claimant had not developed any new impairment or impairments since March 12, 2011. This ignores

evidence that the claimant developed an elevated left hemidiaphragm post surgery, as discussed above, which the ALJ did not acknowledge or address in his opinion. Nor does the ALJ address the documented evidence in the record related to the claimant's osteopenia, degenerative disk disease, and depression.

Next, the ALJ erred in making his finding that the claimant had experienced medical improvement. "In order to determine whether disability continues or ends, the commissioner must determine 'if there has been any medical improvement in [a claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." *Shepherd v. Apfel*, 184 F.3d 1196, 1201 (10th Cir. 1999), *quoting* 20 C.F.R. § 404.1594(a). Here, the ALJ determined that the claimant had achieved medical improvement as of March 12, 2011, because Dr. Beard, a reviewing physician, *estimated* the recuperative period for surgical intervention at six months to a year (Tr. 17). The ALJ noted that Dr. Beard found the claimant's hands and arms were not affected, and that the claimant should be kept at light work therapeutically (Tr. 17). "To apply the medical improvement test, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) which was present at the time of the most recent favorable medical decision finding the claimant disabled." *Shepherd*, 184 F.3d at 1201. The ALJ, however, pointed to no actual medical evidence other than this estimate related to the claimant's estimated post-surgery recuperative period.

But even assuming *arguendo* that the ALJ had properly determined that the claimant had experienced medical improvement beginning March 12, 2011, the ALJ

nevertheless erred in assessing the claimant's RFC. "An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted] [emphasis added], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors include the following: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) [quotation marks omitted], *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ's assessment of Dr. Turner's opinion was deficient because he asserted without support that Dr. Turner's assessment was based on the claimant's own reports, and ignored many of the other factors, including the treatment relationship and evidence in the record related to the claimant's continued need for treatment post-surgery (Tr. 22). Furthermore, the other state reviewing physician RFC assessment was conducted (and therefore applied to) the period during which the claimant was determined to be disabled;

however, the ALJ gave this opinion great weight in determining the claimant *was not* disabled and could perform sedentary work.

Finally, the ALJ erred in considering the combined effect of *all* the claimant's impairments in assessing his RFC. *See Hill v. Astrue*, 289 Fed. Appx. 289, 292 (10th Cir. 2008) ("In determining the claimant's RFC, the ALJ is required to consider the effect of *all* of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'") [emphasis in original]; *McFerran v. Astrue*, 437 Fed. Appx. 634, 638 (10th Cir. 2011) (unpublished opinion) ("[T]he ALJ made no findings on what, if any, work-related limitations resulted from Mr. McFerran's nonsevere mood disorder and chronic pain. He did not include any such limitations in either his RFC determination or his hypothetical question. Nor did he explain why he excluded them. In sum, we cannot conclude that the Commissioner applied the correct legal standards[.]"). *See, e. g., Grotendorst v. Astrue*, 370 Fed. Appx. 879, 884 (10th Cir. 2010) ("[O]nce the ALJ decided, without properly applying the special technique, that Ms. Grotendorst's mental impairments were not severe, she gave those impairments no further consideration. This was reversible error."). For example, the ALJ should have discussed the impact of the claimant's severe and nonsevere impairments, including documents conditions of elevated left hemidiaphragm post surgery, depression, osteopenia, degenerative disk disease, as well as any other severe or nonsevere impairment in assessing the claimant's RFC. This is particularly important in light of Dr. Paris's assessment of the claimant's ability to perform in a work environment, *in light of his combination of impairments. See, e. g., Grotendorst v. Astrue*, 370 Fed. Appx. 879, 884

(10th Cir. 2010) ("[O]nce the ALJ decided, without properly applying the special technique, that Ms. Grotendorst's mental impairments were not severe, she gave those impairments no further consideration. This was reversible error."). Accordingly, the decision of the Commissioner should be reversed because the Commissioner has failed to meet her burden. *See Hayden*, 374 F.3d at 994.

The claimant asserts that, upon reversal, he is entitled to reinstatement of his benefits, along with back payments. *See Hayden*, 374 F.3d at 994 ("Thus, reversal in this case means that the case is simply remanded to the agency, and that Ms. Hayden, who has already been adjudged to be disabled by the Commissioner, maintains her disability status and is entitled to payment of any benefits that have been withheld during the appeals process. It is up to the agency to decide whether to begin new termination proceedings."). The Commissioner argues that award of benefits is not appropriate here because this case involves an initial disability determination, and *Hayden* dealt solely with termination of benefits. Under 20 C.F.R. § 416.996, if the ALJ "determine[s] that [a claimant] is not eligible for disability . . . benefits because the physical or mental impairment(s) on the basis of which such benefits were payable is found . . . to no longer be disabling, and you appeal that determination, you may choose to have your disability or blindness benefits . . . continued pending reconsideration and/or a hearing before an administrative law judge on the disability/blindness cessation determination." 20 C.F.R. §416.996(a). Therefore, "[i]f a court orders that your case be sent back [to the ALJ] (remanded) and your case is sent to an [ALJ] for further action under the rules provided in § 416.1483, the [ALJ's] decision or dismissal order on your medical cessation appeal

is vacated and is no longer in effect," and the claimant should be provided notice that he may elect to have his benefits continued. 20 C.F.R. § 416.996(e)(3) – (4). Accordingly, the undersigned Magistrate Judge agrees that the claimant is entitled to continuation of benefits as of the date those benefits ceased: March 12, 2011. *See McCleave v. Colvin*, 2013 WL 4840477, at *7 (W.D. Okla. Sept. 10, 2013) ("Following *Hayden*, the undersigned agrees with Plaintiff that a reversal of the Commissioner's decision to terminate her disability benefits means she is entitled to payment of the benefits that she would have received as a disabled individual from the date on which those benefits ceased[.]"). Furthermore, the undersigned Magistrate Judge notes that "reversal in this case means that the case is simply remanded to the agency, and that [the claimant], who has already been adjudged to be disabled by the Commissioner, maintains [his] disability status and is entitled to payment of any benefits that have been withheld during the appeals process. It is up to the agency to decide whether to begin new termination proceedings." *Hayden*, 374 F.3d 986. *See also Butler v. Colvin*, 2014 WL 1331164, at *4 (E.D. Okla. Mar. 11, 2014) ("The Tenth Circuit has determined that in a termination of benefits case, reinstatement of benefits is the appropriate remedy upon reversal, including an award of past benefits which would have been due but for the termination. Accordingly, this Court will recommend that benefits be restored and Defendant be ordered to pay any benefits which would have been paid since the date of termination. It will be up to the Commissioner to decide whether to bring further termination proceedings."), *citing Hayden*, 374 F.3d at 994; *Manser v. Barnhart*, 2005 WL 1694074, at *1 (D. Alaska July 18, 2005) ("While the Defendant argues that it is unresolved

whether the Plaintiff is disabled, that argument is erroneous. In 1996, the Plaintiff was found to be disabled and there have been no valid proceedings to refute that finding. . . . As such, Plaintiff's motion is GRANTED and the case will not be remanded for a continuing disability review.").

## Conclusion

The undersigned Magistrate Judge hereby PROPOSES a finding by the Court that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The undersigned Magistrate Judge thus RECOMMENDS that the Court reverse the decision of the Commissioner. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 11th day of September, 2015.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**